IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BAD RHINO GAMES, LLC,

        Plaintiff,

v.     Case No. 23-2303-JWB

TURN ME UP GAMES, INC.,

        Defendant.

**MEMORANDUM AND ORDER**

This matter is before the court on cross motions for summary judgment. (Docs. 72, 78.) The motions are fully briefed and ripe for decision. (Docs. 73, 79, 93, 97, 103, 106.) The motions are DENIED for the reasons stated herein.

**I.     Facts[1]**

This case involves parties who worked on a video game called Wayfinder ("the game"). The parties are Plaintiff Bad Rhino Games, LLC, ("Bad Rhino") and Defendant Turn Me Up Games, Inc. ("TMU"). In June 2019, prior to the parties entering into the contract at issue, Airship Syndicate Entertainment, Inc. ("Airship") and Digital Extremes ("DEX"), entered into a publishing agreement for the game. (Doc. 113 (redacted); Doc. 97-1 (sealed).) Under that agreement, Airship was referred to as the developer of the game and it granted DEX an exclusive license to publish the game on any platform identified in an exhibit to the publishing agreement. (*Id.* at § 1.2.) Apart from those rights granted in the publishing agreement, the parties were to retain the rights to their respective Intellectual Property. Intellectual Property was broadly defined

---

[1] The facts set forth herein are material to the issues on summary judgment and uncontroverted, or viewed in a light most favorable to the nonmoving party.

in the publishing agreement to mean any existing rights associated with works of authorship, trade secrets, patents, and other intellectual property. (*Id.* at § 1.1.)

In late October and early November 2021, TMU was approached by DEX to work on the game. TMU subsequently entered into an agreement with DEX. (Doc. 109, Exh. 1.) TMU also entered into an Independent Contractor Agreement (the "ICA") with Bad Rhino. (Doc. 22-2.) Essentially, TMU contracted with Bad Rhino to assist in the performance of obligations that TMU was required to complete under its agreement with DEX. The ICA is also referred to by the parties as the porting agreement and required Bad Rhino to port the game to the Sony PlayStation platform and the Microsoft Xbox platform. According to Bad Rhino, game porting is "the process of converting a game that is compatible with one platform (e.g., playable on a [personal computer]) to a format that is compatible with another platform (e.g., playable on Xbox)." (Doc. 71 at 5.)

The ICA defined the game as a version of the "Property." (Doc. 22-2 at 2.) This term was then defined as an interactive entertainment software product that was published by DEX. (*Id.* (redacted); Doc. 23 at 3 (sealed).) The ICA included a schedule of deliverables and the associated delivery dates for performance by Bad Rhino. These items were grouped by "Milestones," which described specific deliverables to be produced along with amounts to be paid for the deliverables. (Doc. 22-2; Doc. 23; Doc. 73 at 8; 97 at 7.) Bad Rhino submitted invoices to TMU for its work on the Milestones. The ICA provided that the agreement could be terminated by TMU without cause. (Doc. 22-2 at § 6.) If terminated under this provision, TMU was to pay any sums due and owing for Deliverables which were completed and approved under the Agreement. (*Id.*)

The ICA also had a provision titled "Non-Compete" which stated as follows:

By signing this agreement, BAD RHINO understands that TMUG has invested considerable time and money into developing the relationship it has with its publishing partners.

2

> As such, for the duration of this agreement and for sixty (60) months after end of this agreement, for whatever reason, BAD RHINO agrees to not engage in any business with the publisher of the Game with which TMUG has signed an agreement.
>
> The parties hereto hereby acknowledge and agree that (i) TMUG would be irreparably injured in the event of a breach by BAD RHINO of any of its obligations under this Section 13, (ii) monetary damages would not be an adequate remedy for any such breach, and (iii) TMUG shall be entitled to injunctive relief, in addition to any other remedy which it may have, in the event of any such breach.

(Doc. 22-2 ¶ 13.)

On February 1, TMU signed another agreement with DEX for additional development work on the game. (Doc. 109, Exh. 2.) On that same date, TMU and Bad Rhino entered into an additional agreement (a master service agreement) so that Bad Rhino could help work on the additional development for the game. (Doc. 79-3 ¶ 9; Doc. 22-4.) On April 1, 2022, TMU also entered into a master services agreement with Airship for development work on the game. (Doc. 109, Exh. 3.) During the performance of the ICA, Bad Rhino, TMU, DEX, and Airship engaged in communications via Slack and videoconferences regarding the game. (Docs. 79-2; 97 at 28; 106 at 4.) On July 26, 2022, Ron LaJoie from Airship reached out to Ryan Manning at Bad Rhino and asked if Bad Rhino would be interested in a partnership. (Doc. 73-17 at 5.) On July 28, Manning responded by sending a contract to LaJoie.

On August 1, 2022, DEX terminated its master service agreement with TMU. (Doc. 79-3 ¶ 13.) TMU then terminated the master service agreement it had with Bad Rhino. (Doc. 73-1 ¶ 19.) Notably, the email communications regarding the termination of those services occurred on July 26, 2022, the same date that LaJoie from Airship reached out to Manning at Bad Rhino. (Doc. 73-16.) TMU told Manning to wrap up the current tasks but that this would not affect the porting agreement (ICA). The emails indicate that Manning was concerned about the loss of work on the project. (*Id.* at 10.)

On August 18, Airship signed a master service agreement with Bad Rhino to provide development services for the game. The effective date of the agreement was August 1, 2022. (Doc. 109, Exh. 5.) After entering into the August 2022 master service agreement, Bad Rhino participated in video conferences with DEX and Airship regarding the game. (Doc. 97 at 29; 106 at 4.) TMU terminated the ICA with Bad Rhino in April 2023. Bad Rhino put forth evidence that it performed services under the ICA until that agreement was terminated. (Doc. 73-1 ¶ 15.) According to TMU, it did not know of the alleged business relationship between Bad Rhino and Airship and DEX arising out of the August 2022 master service agreement until 2023. (Doc. 79-3 ¶¶ 13–14.) According to an exhibit submitted by TMU, in early 2023, Bad Rhino's website advertised that it had "partnered with Airship Syndicate & Digital Extremes" on the game. (Doc. 79-1.) On May 17, 2023, TMU sent a notice of breach to Bad Rhino stating that it believed Bad Rhino breached the non-compete provision of the ICA. (Doc. 73-14.)

Bad Rhino filed suit in July 2023 alleging breach of contract for failing to pay amounts under the ICA. (Doc. 1.) Bad Rhino contends that TMU failed to pay for Milestones 9, 16, 17, and 18 and that it performed the services under those Milestones. (Doc. 73-1 ¶ 9.) TMU approved the services for Milestone 9 in July 2022, Milestone 16 in January 2023, and Milestone 17 in March 2023. (Doc. 73 at 9; 97 at 8.) The parties dispute whether the services for Milestone 18 were approved. TMU stipulated that it did not pay for services in connection with Milestones 16, 17, and 18. (Doc. 71 at 3.) The total amount billed for these Milestones is at least $645,675. (Doc. 73-1 ¶ 12.) Bad Rhino has now moved for summary judgment on its claim of breach of contract.

TMU opposes Bad Rhino's motion for summary judgment on the basis that Bad Rhino materially breached the ICA first and therefore it is excused from performing under the ICA.

TMU also moves for summary judgment on its counterclaim of breach of the ICA for Bad Rhino's alleged violation of the non-compete provision.

## II.     Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)). Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 935 F.2d 1106, 1110 (10th Cir. 1991). The court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III.    Analysis

The parties assert that their breach of contract claims are governed by Kansas law, and the court agrees.[2] (Doc. 71 at 2.) Both parties have moved for summary judgment on their respective breach of contract claims. To state a claim for breach of contract under Kansas law, a plaintiff must show: (1) the existence of a contract; (2) sufficient consideration; (3) the other party's

---

[2] Kansas courts apply the rule of lex loci contractus to breach of contract claims. *Mirville v. Allstate Indem. Co.*, 71 F. Supp. 2d 1103, 1107 (D. Kan. 1999). Under this rule, the law of the state where the parties made the contract controls. *Id.* Here, the parties agree that Kansas law governs the breach of contract claims.

performance or willingness to perform; (4) breach of the contract; and (5) damages caused by the breach. *Stechschulte v. Jennings*, 297 Kan. 2, 23, 298 P.3d 1083, 1098 (2013).  The parties agree that the first two elements are met on both claims.  The parties, however, disagree as to the remaining elements.

With respect to the parties' willingness to perform, Bad Rhino asserts that it was willing to perform and did perform but that TMU breached the contract by failing to pay Bad Rhino for work it submitted.  In response, TMU asserts that it was excused from performance due to Bad Rhino's breach of the non-compete provision.  TMU also argues that it did not approve all of the submitted invoices, but it is clear that the issues regarding the invoices are fact questions for a jury.  The court will examine whether there are disputes of fact regarding the breach of the non-compete provision.

Under Kansas law, a "party is not liable for a material failure of performance if it can show that the other party committed a prior material breach of the contract; in such event, the prior breach discharged the party's own duty to perform." *Hawley v. Shear*, No. 20-2562-EFM, 2023 WL 2784838, at *4 (D. Kan. Apr. 5, 2023) (quoting *Fusion, Inc. v. Neb. Aluminum Castings, Inc.*, 1997 WL 51227, at *15 (D. Kan. 1997) (applying Kansas law)).  This rule "precludes a party who has first materially breached a contract from attempting to enforce that contract until the breach is cured and entitles the nonbreaching party to suspend or terminate performance under that contract as long as the breach remains uncured." *Id.* (quoting *Bank of Am., N.A. v. Narula*, 46 Kan. App. 2d 142, 261 P.3d 898, Syl ¶ 3 (2011)).

The parties do not dispute that the non-compete provision is a material provision in the ICA.  The issue is whether Bad Rhino breached that provision prior to any breach by TMU for nonpayment.  It is undisputed that Bad Rhino signed an agreement with Airship in August 2022.

Bad Rhino argues that it did not breach the non-compete because that provision only prohibits it from engaging in business with the publisher, which is DEX and not Airship. In response, TMU argues that Airship is a publisher. Alternatively, TMU argues that Bad Rhino engaged in business with DEX in August 2022 even though the parties did not enter into a contractual agreement.

The provision at issue states that "for the duration of this agreement and for sixty (60) months after end of this agreement, for whatever reason, BAD RHINO agrees to not engage in any business with the publisher of the Game with which TMUG has signed an agreement." (Doc. 22-2 ¶ 13.) The parties do not argue that the term "publisher" is ambiguous. Reviewing the ICA, the term "publisher" is not defined. The ICA does, however, state that the game was "published" by DEX. (Doc. 23 at 3.) Therefore, it is clear, and the parties agree, that DEX is a publisher under the terms of the ICA. Bad Rhino contends that DEX is the only publisher of the game and the only publisher at issue under the non-compete clause in the ICA. In response, TMU argues that Airship retained publishing rights to some platforms and that it only licensed the publishing rights to DEX. TMU also points to the language in the non-compete provision that states that TMU "invested considerable time and money into developing the relationship it has with its publishing partners" in support of its contention that publisher refers to both DEX and Airship. (*Id.*) The problem, however, is that although Airship might have retained some publishing rights under the publishing agreement, there is no evidence that Airship was a publisher as that term is reasonably interpreted. *See Wichita Clinic, P.A. v. Louis*, 39 Kan. App. 2d 848, 853, 185 P.3d 946, 951 (2008). "The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided." *Id.* (citing *Johnson County Bank v. Ross*, 28 Kan.App.2d 8, 10–11, 13 P.3d 351 (2000)). TMU fails to explain how Airship is a publisher when there is no evidence that Airship ever published any version of the game at the time period at issue.

TMU's arguments in support of finding that Airship is a publisher are unpersuasive. TMU merely points to statements that Airship relies on its "publishing partnerships" for the game. (Doc. 97 at 38.) This statement does not indicate that Airship was a publisher of the game. TMU also argues that Airship was a publisher because it worked with DEX and DEX was publishing the game on its behalf. (*Id.*) This argument is not persuasive and TMU fails to cite to any authority in support. It is essentially equivalent to arguing that a book author is a publisher because the author works with the publishing company on getting his book ready to publish.

The court finds that there is no dispute of material fact as to whether Airship was a publisher of the game at the time periods at issue. That does not result in a grant of summary judgment in favor of Bad Rhino, however. TMU alternatively argues that Bad Rhino breached the non-compete provision by engaging in business with DEX. It is undisputed that Bad Rhino did not have a contract with DEX but that Bad Rhino continued to meet with DEX and Airship during its performance under the Airship agreement. Bad Rhino argues that it was not engaging in "business" with DEX during this time period. The term "business" is not defined in the ICA and the agreement does not assist the court in determining what the parties meant by engaging in business. The court finds that this is a fact question for a jury. *See Beaty v. Kansas Athletics, Inc.*, 454 F. Supp. 3d 1096, 1108–09 (D. Kan. 2020) (when the language in a contract is ambiguous, interpretation becomes a question of fact).

Bad Rhino alternatively argues that TMU is estopped from enforcing the non-compete provision due to its conduct during the parties' relationship. Essentially, Bad Rhino argues that it was required to work with DEX, Airship, and TMU during the performance of the ICA and that TMU never informed Bad Rhino that it was in breach of the ICA. (Doc. 93 at 13.) This argument is not clear as to the time frame at issue. If Bad Rhino is arguing that TMU should have notified

it that it was in breach due to required communications to perform the ICA (as TMU is interpreting the argument), than Bad Rhino's argument is not persuasive as the contacts were part of the performance of the agreement. However, if Bad Rhino is asserting that TMU had knowledge of the relationship that was created after TMU's involvement was terminated and failed to give notice to Bad Rhino of the breach, then Bad Rhino may present those arguments to the jury.

Bad Rhino also argues that TMU has waived the right to enforce the non-compete provision. (Doc. 93 at 14.) This defense does not appear in the pretrial order. (Doc. 71 at 14–15.) Therefore, the court will not consider it as it was not preserved.

In sum, there is a genuine material dispute of fact as to whether Bad Rhino breached the non-compete provision of the ICA. There are also disputes of material fact as to damages. Therefore, summary judgment on both parties' claims of breach of contract must be denied.

**IV.  Conclusion**

The parties' motions for summary judgment (Docs. 72, 78) are DENIED.

IT IS SO ORDERED.  Dated this 17th day of January, 2025.

__s/ John W. Broomes_____  
JOHN W. BROOMES  
UNITED STATES DISTRICT JUDGE