IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BAD RHINO GAMES, LLC,

      Plaintiff,

v.                                                                             Case No. 23-2303-JWB

TURN ME UP GAMES, INC.,

      Defendant.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendant and Counterclaimant Turn Me Up Games's motion for relief from judgment, Plaintiff Bad Rhino Games's motion to alter judgment, and motions for attorney's fees. (Docs. 157, 159, 160, 165[1], 168.) The motions have been fully briefed and are ripe for decision. (Docs. 158, 161, 166, 167, 169.) Defendant's motion is DENIED and Plaintiff's motions are GRANTED IN PART and DENIED IN PART for the reasons stated herein.

**I.   Facts and Procedural History**

This case involves a contract dispute between the parties where both parties presented claims of breach of contract to the jury. Bad Rhino Games, LLC ("Plaintiff" or "Bad Rhino") initially filed suit in July 2023 alleging breach of contract for failing to pay amounts due under the parties' agreement. (Doc. 1.) Turn Me Up Games ("TMU") then filed a counterclaim for breach of contract asserting that Bad Rhino violated the noncompete provision in the agreement. A jury trial was held from June 23 to 25, 2025. The jury found in favor of Plaintiff.

---

[1] Turn Me Up Games filed a supplemental motion for relief from judgment to add record citations to the memorandum after the transcript was filed. (Doc. 165 at 1, n.1.) Otherwise, it is unchanged from the original motion.

1

At trial, both parties presented evidence regarding the contract and their relationship. The parties also stipulated to several facts which were presented to the jury and included in the jury instructions. (Doc. 154 at 4.) The contract at issue related to porting a video game ("Wayfinder" or the "game") from its PC version to Xbox and PlayStation. Airship Syndicate Entertainment ("Airship") was the developer of the game and Digital Extremes Ltd ("DEX") was the publisher of the game. As a publisher, DEX financed the development of the game. DEX and TMU had originally contracted for services relating to the game. On October 22, 2021, TMU then entered into an Independent Contractor Agreement (the "ICA") with Bad Rhino to perform some of the work that TMU was obligated to perform for DEX. Under the agreement, Bad Rhino would be paid after performing certain milestones. Bad Rhino would submit invoices to TMU for the completion of the milestones and TMU would then submit payment for completed and approved services only. Scott Cromie testified that TMU would review the milestone, provide feedback for changes if necessary, and then submit it to DEX for payment. Once the milestone was approved, Bad Rhino could submit an invoice. The ICA provided that Bad Rhino was to be paid within 30 days of receiving the invoice. (Ex. 6 at 2.) The ICA provided that the agreement could be terminated by TMU without cause but that TMU would have to pay for certain work that was completed at the time of termination. The ICA also had a non-compete provision which prohibited Bad Rhino from engaging in business with the publisher, DEX.[2] The parties later entered into a master services agreement for Bad Rhino to provide additional development work for the game after DEX had contracted with TMU for that additional work. (Ex. 1, 2.) The development work was different from the porting work that was being performed under the ICA. Development work includes the art, coding, and anything related to making and releasing a game. (Tr. at 344:18–22.)

---

[2] The court ruled on summary judgment as a matter of law that DEX was the only publisher of the game during the performance of the ICA. (Doc. 114.)

After entering into the ICA, there were typically three to four meetings a week about the work on Wayfinder. These meetings included individuals from Airship, DEX, TMU, and Bad Rhino. (Tr. at 432:12–433:7.) Bad Rhino performed its work under the ICA and TMU submitted payments to Bad Rhino in connection with services performed under specific milestones as set forth in the ICA. The parties stipulated that Bad Rhino sent invoices 210, 242, 246, and 249 to TMU for payment but that those invoices were never paid by TMU. (Doc. 154 at 4.) Invoice 210 related to the work performed for Milestone 9 and was sent to TMU on July 20, 2022. (Ex. 15.) It was approved by TMU on July 18. (Ex. 12.)

While working on the ICA, Ryan Manning of Bad Rhino testified that he took no direction from DEX or Airship. Rather, their work was directed by TMU. (Tr. at 363:11–25.) On July 29, 2022, DEX and Airship terminated their master service agreements with TMU. (Ex. 47, 49; Tr. at 87:17–89:19.) TMU also terminated the master service agreement with Bad Rhino for the development work. This was frustrating to Bad Rhino because it had hired an additional ten to twelve people to do the work on Wayfinder. Airship then emailed Manning about a potential opportunity for work. (Tr. at 401:6–19.) Manning sent rates to Airship and learned a couple of weeks later that the work was for Bad Rhino to continue the development work directly with Airship on Wayfinder. (Tr. at 403:2–21.) On August 18, Bad Rhino and Airship signed a master service agreement with an effective date of August 1, 2022, for Bad Rhino to provide development services for the game to Airship. (Ex. 53.) Bad Rhino did not tell TMU that it entered into the agreement with Airship to do the co-development work. Bad Rhino continued to perform the porting work for TMU under the ICA.

Manning testified that DEX did not direct Bad Rhino to enter into the master services agreement with Airship, had no involvement with the agreement, and did not have any input on

3

Bad Rhino's work under the agreement. (Tr. at 410:21–411:4.) Manning further testified that Airship and Bad Rhino used a Slack channel and another platform called Asana for the co-development work. DEX was not on the channels that Airship and Bad Rhino used to work on the development work for the project. (*Id.* at 411:5–23.) Further, the meetings related to the development work only included Airship and Bad Rhino.

Richard Browne also testified during trial. During the performance of the ICA, Browne was working for DEX as the Head of External Projects and was very familiar with the parties and their work on the game. Browne testified that DEX decided to terminate TMU's development work on the game in July 2022 and turn that work over to Airship. (Tr. at 313:5–15.) Browne testified that DEX did not direct Airship to hire Bad Rhino to do the co-development work and that it was up to Airship to decide what subcontractor deals to make for the company. (Tr. at 319 at 17–24.) After Bad Rhino began doing the development work for Airship, DEX did not pay for any of the work and it did not direct Bad Rhino's work. (Tr. at 328:14–19.) Browne further testified that DEX never entered into an agreement with Bad Rhino and did not engage in any business with Bad Rhino.[3] (Tr. at 327:21–23, 328:24–329:1.)

The work related to Milestone 16 was approved on February 21, 2023, and the related invoice (24) was submitted on February 25. (Ex. 25, 28.) The work related to Milestone 17 was approved on March 30 and the invoice was submitted on April 4, 2023. (Ex. 34, 37.) With respect to the work on Milestone 18, TMU told Bad Rhino to submit its invoice for payment on April 21, 2023. (Ex. 42.) Invoice 249 was submitted on April 24 but not paid. (Ex. 44.) Ryan Manning testified that all work was completed on those milestones. Scott Cromie of TMU testified that Milestone 18 was never approved. (Doc. 162, Tr. at 74:1–8.) Upon questioning from the court,

---

[3] Browne left DEX in November 2023 when the external projects team was shut down and Airship took over the publishing in early 2024.

Cromie testified that if an invoice wasn't approved that the developer would typically be able to make corrections or fix issues with the milestones so that it could be approved. (*Id.* at 80:3–23.) Cromie admitted, however, that this scenario did not occur with Milestone 18 and that TMU had instructed Bad Rhino to submit an invoice for the work. (*Id.* at 81:21–82:14.)

On May 17, 2023, TMU sent a notice of breach to Bad Rhino stating that it believed Bad Rhino breached the non-compete provision of the ICA. (Doc. 73-14.) Cromie testified that TMU did not pay the invoices related to Milestones 9 and 16–18 because TMU believed that Bad Rhino breached the ICA by engaging in business with DEX. (Doc. 162, Tr. at 85:2–8.) There was no evidence admitted at trial that Bad Rhino entered into an agreement with DEX or received any payment from DEX. There was evidence that Bad Rhino advertised on its website that it "partnered" with Airship and DEX on the video game. (Ex. 811.) Manning testified that Bad Rhino did not engage in business with DEX after signing the ICA. (Tr. at 353:11–13.) Manning testified that he agreed to signing the noncompete agreement because DEX did not have any video game titles that Bad Rhino had an interest in working on. (*Id.* at 354:2–13.) The noncompete agreement did not prevent Bad Rhino from working with Airship, and Manning testified that there were no discussions that would indicate that TMU believed that the noncompete provision also applied to Airship. (*Id.* at 355:14–23.)

The jury was instructed on the parties' competing claims of breach of contract. TMU argued that it was excused from performance under the ICA because Bad Rhino breached the ICA by engaging in business with DEX. Bad Rhino argued that it did not engage in business with DEX and, in any event, that TMU first breached the ICA by failing to pay it amounts due under the agreement for the work it performed under Milestones 9, and 16 through 18. The jury found that TMU breached the ICA and returned a verdict in favor of Bad Rhino in the amount of $645,675.

5

(Doc. 155.) The court entered judgment in accordance with the jury verdict. TMU now moves for relief from judgment or a new trial on the basis that Plaintiff failed to produce evidence during discovery. Plaintiff asks the court to amend the judgment for prejudgment interest and asks for attorney's fees and costs in accordance with the contract.

**II.   Standard**

TMU moves for relief from judgment under Federal Rule of Civil Procedure 60(b) and alternatively moves for a new trial under Rule 59(e). TMU asserts that Bad Rhino's conduct in failing to produce certain evidence during discovery amounted to fraud, misrepresentation, or misconduct. TMU further asserts that the newly discovered evidence provides a basis to set aside the judgment and grant a new trial.

After a jury trial, a motion for new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Such a motion is 'generally not regarded with favor, and is granted only with great caution.'" *Smith v. Cochran*, 182 F. App'x 854, 864 (10th Cir. 2006) (quoting *United States v. Perea,* 458 F.2d 535, 536 (10th Cir. 1972)). "The party seeking to set aside a jury verdict must show either trial error which constitutes prejudicial error or that the verdict was not based on substantial evidence." *Id.* (citing *White v. Conoco, Inc.*, 710 F.2d 1442, 1443 (10th Cir. 1983)).

With respect to seeking a new trial based on newly discovered evidence under both Rule 59 and 60, Plaintiff must show the following: "(1) the evidence was newly discovered since the trial; (2) the moving party was diligent in discovering the new evidence; (3) the newly discovered evidence was not merely cumulative or impeaching; (4) the newly discovered evidence is material; and (5) ... a new trial with the newly discovered evidence would probably produce a different

result." *Hayes v. SkyWest Airlines, Inc.*, 12 F.4th 1186, 1200 (10th Cir. 2021). The newly discovered evidence must be admissible and must have existed at the time of trial. *Id.*

Rule 60(b)(3) allows a court to "relieve a party . . . from a final judgment" based on fraud, misrepresentation, or misconduct by an opposing party. The party seeking relief "must show clear and convincing proof of fraud, misrepresentation, or misconduct." *Campbell v. Meredith Corp.*, 345 F. App'x 323, 326 (10th Cir. 2009) (citing *Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281, 1290 (10th Cir. 2005)). Moreover, the "challenged behavior must *substantially* have interfered with the aggrieved party's ability fully and fairly to prepare for and proceed at trial." *Id.* Relief is to be granted only in exceptional circumstances. *See Servants of Paraclete v. Does*, 204 F.3d 1005, 1009 (10th Cir. 2000).

### III. Analysis

#### A. TMU's Motion for Relief from Judgment

TMU argues that newly discovered Discord messages between Ryan Manning and John Henley[4], Manning's agent employed by a third party, show that Bad Rhino engaged in business with DEX. TMU asserts that the messages should have been disclosed based on a discovery request to Bad Rhino and that the failure to disclose the messages amounted to fraud and misrepresentation. In response, Bad Rhino argues that the messages are not material and would not affect the outcome of the matter. Alternatively, Bad Rhino argues that it had no obligation to produce the messages and TMU was not diligent in seeking discovery from Henley.

In March 2024, TMU served discovery on Bad Rhino. There were disputes regarding the scope of the requests for documents and a discovery conference was held. (Doc. 51.) Ultimately, Bad Rhino responded to the discovery request and, in accordance with the court's order, construed

---

[4] Henley would try to obtain work for Manning/Bad Rhino and receive a commission from that work.

7

the document request for "All Documents relating to Your communications with third parties, including but not limited to DEX and Airship Syndicate, regarding Bad Rhino's agreement to engage in business (if any) with DEX and/or Airship Syndicate, dated between August 1, 2021, and the present." (Doc. 161-5 at 4.) The term "documents" was defined to include electronically stored information and all methods of communication including Discord. (*Id*. at 2.) Bad Rhino indicated that all responsive discovery to this request was produced. Bad Rhino, however, did not produce any Discord chats between Manning and Henley. On the day before trial, Cromie contacted Henley about any communications Henley may have about commissions Bad Rhino owed Henley. In response, Henley sent Cromie a "screenshot of a Discord conversation between himself and Mr. Manning where Mr. Manning appears to state that he had to 'fight/scrap to get the contract' with Airship." (Doc. 161-1 ¶ 9.) That document was used during trial to impeach Manning's testimony. The court denied counsel's request to admit the document.

After trial concluded, Cromie asked Henley if he had any other written Discord communications with Manning. Henley then provided Cromie with an Excel spreadsheet of the Discord communications from September 23, 2020, to May 15, 2023. (*Id.* ¶ 11.) This spreadsheet is 146 pages long. (Doc. 166-2.) TMU asserts that there are several statements included in the communications between Henley and Manning that support TMU's claim that Bad Rhino engaged in business with DEX.

At the outset, the court will presume that the Discord chats were relevant and responsive to the discovery request. Nevertheless, TMU has the burden to show that the new evidence is admissible, material, and would affect the outcome at trial. In ruling on the motion, the court has considered the evidence and argument contained in TMU's brief. The court has not and will not independently search a 146-page document for evidence in support of TMU's motion.

First, TMU's motion makes no effort to show that the 146-page exhibit would be admissible at trial. While Manning's statements may be admissible against him, Henley was not a party to this matter and did not appear as a witness at trial. Therefore, TMU has not met its burden to show that Henley's statements are admissible. Further, with respect to Manning's statements, the court previously ruled that Manning's prior statements in a Discord conversation between Henley and Manning could only be used as impeachment evidence. Impeachment evidence is not sufficient for a new trial. Therefore, because TMU has made no effort to address the admissibility of the 146-page exhibit, TMU has failed to meet its burden. Even if the evidence were admissible, the court alternatively finds that TMU has failed to show that these communications were material or that they would change the outcome of the trial given the evidence that was presented to the jury.

The first cited conversation occurred on October 25, 2021, where Manning sent a message to Henley, stating, "As we continue working on the port side of things [for Wayfinder], I naturally expect conversations to filter back to Airship...in hopes that they realize we can help them out beyond just porting." Mr. Henley responded, "BUT everything goes through digital extreme. Vendor choice and all…I guess the downside of having a publisher." (Doc. 161 at 7) (citing Ex. A, Lines 3077-3078.) With respect to Manning's statement, this is evidence that he wanted to work with Airship which was not prohibited by the noncompete. With respect to Henley's statement, it is hearsay as he was not a witness at trial. Further, given that he was not an employee of DEX, there is no basis for him to have personal knowledge of whether "everything goes through digital extreme." Moreover, both Browne and Manning testified that DEX did not have a say in who Airship contracted with.

TMU then cites to an email Henley sent to Richard Browne on November 3, 2021, in which he asks if DEX uses art and design vendors. (Doc. 161 at 8.) According to TMU, Henley sent this email on behalf of Manning to attempt to engage in business with DEX. However, there is no evidence that anything ever came of this email. Browne testified that DEX did not engage in any business with Bad Rhino.

In January 2022, Henley offered to send an email to both Airship and DEX that Henley knew of a team with a bunch of resources. Manning responded by saying yes. Again, Henley's statements are not admissible. In any event, these statements are not material and would not change the outcome of the trial as they are not evidence that Bad Rhino engaged in business with DEX. On August 25, 2022, Henley asked Manning if he was working with Airship. Henley then shared a screenshot of his text message to Hugo on Discord with Manning. The text message stated that he had "confirmed with Ryan [Manning], they are working with Airship. DE[X] fully approved it." (Doc. 161 at 11.) Again, these statements are hearsay and would not be admissible. Further, the evidence does not show how Henley would have knowledge that DEX approved the Airship/Bad Rhino contract. In any event, the evidence at trial from Browne, who was employed by DEX, was that DEX did not have any say in the Airship/Bad Rhino contract and that Airship could contract with whatever company it decided to contract with. Evidence from Manning's agent about DEX approving Airship's subcontract would not change the outcome of trial given the evidence that was presented. And, in any event, by this date TMU had materially breached the ICA by failing to pay for the work related to milestone 9 which was invoiced in July 2022.

The remaining cited conversations do not merit a discussion as they are not material to the issues nor support a finding that there would have been a different outcome. Most of the conversations cited by TMU involve discussions of "Bad Rhino's efforts to work directly with

10

Airship" which was not prohibited by the ICA. (Doc. 161 at 12.) The jury already knew that Bad Rhino worked with Airship and did not inform TMU of the relationship. Therefore, this evidence is cumulative to the evidence presented at trial.

The court finds that the new evidence cited by TMU would not have been admissible as it included hearsay statements and was not material to the issues at trial. Further, even if the evidence was material and admissible by calling Henley as a witness, the evidence would not be likely to produce a new outcome.

The jury was presented with significant evidence that TMU breached the ICA by failing to pay Bad Rhino for services it performed under the agreement. It was clear that TMU did not pay Bad Rhino for Invoice 210 that was sent to TMU on July 20, 2022. (Ex. 15.) Under the ICA, TMU had 30 days to pay that invoice and it did not. The jury determined that TMU materially breached the ICA by failing to pay the overdue invoices and that Bad Rhino did not breach the ICA. This new evidence does not support a finding that Bad Rhino in fact breached the ICA before TMU's material breach by engaging in business with DEX. Rather, it is comprised of messages between Manning and his agent where there are vague references about things having to go through DEX and that DEX approved of the Airship/Bad Rhino contract.

Therefore, the court finds that TMU is not entitled to a new trial on the basis of the new evidence.

TMU also argues that Bad Rhino engaged in fraud, misrepresentation, and misconduct by failing to produce the Discord chats.[5] TMU's evidence of this conduct is merely the failure to produce the documents which TMU characterizes as intentional concealment. (Doc. 161 at 15.)

---

[5] Although TMU argues this in its initial brief (Doc. 161 at 15), TMU's reply brief indicates that it was not relying on fraud or misrepresentation as a basis for its motion but that it was only relying on Rule 60(b)(2). (Doc. 169 at 6.) TMU then states that the standard has been met. The court will address Rule 60(b)(3) as it was raised by TMU in the briefing.

11

The Tenth Circuit has held that a failure to disclose information may constitute misconduct under Rule 60(b)(3); however, "this usually requires the violation of a specific discovery request or order." *Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281, 1292 (10th Cir. 2005). Further, "the challenged behavior must substantially have interfered with the aggrieved party's ability fully and fairly to prepare for and proceed at trial." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). Given the discussion of the evidence herein, the court finds that the failure to disclose did not substantially interfere with TMU's ability to fully and fairly prepare for and proceed at trial. Further, there is no evidence that there was an intent to deceive on behalf of Bad Rhino.

TMU's motion to alter judgment or, alternatively, for a new trial is DENIED.

**B. Interest**

Bad Rhino also moved to alter the judgment to add prejudgment interest. (Doc. 157.) TMU did not file a response in opposition. Under Kansas law, prejudgment interest is set "at the rate of 10% per annum when no other rate of interest is agreed upon." K.S.A. § 16-201. Prejudgment interest is allowable on liquidated claims. *Hutton Contracting Co. v. City of Coffeyville*, 487 F.3d 772, 786 (10th Cir. 2007) (citing Miller v. Botwin, 258 Kan. 108, 899 P.2d 1004, 1012 (1995)). "A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same become definitely ascertainable by mathematical computation." *Id.*

Here, the ICA does not set forth an amount for prejudgment interest. Therefore, the statutory amount is applicable. It is clear from the evidence that the amounts due became liquidated when they were invoiced by Bad Rhino. Those invoices had a due date of 30 days after the invoice. Bad Rhino has calculated the prejudgment interest due by applying the statutory rate

of 10% per annum to each of the Invoices from their respective due dates through the date of judgment, June 25, 2025. The total amount of prejudgment interest due is $155,974.34.

Bad Rhino's motion to alter the judgment is granted. The judgment will be altered to reflect a new total amount of $801,469.34.

### C. Attorney's Fees

The ICA provides that the prevailing party is entitled to reasonable attorney fees and costs. On July 9, Plaintiff filed a motion for attorney's fees and costs. (Doc. 159.) The parties then conferred regarding the fee issue and Plaintiff filed an unopposed motion for attorney's fees on August 19. (Doc. 168.) The unopposed motion seeks $333,839.00 in attorney's fees. The court has reviewed the records and finds that the number of hours billed and the hourly rates charged are reasonable.

Plaintiff's unopposed motion for fees (Doc. 168) in the amount of $333,839.00 is therefore granted. With respect to the initial motion for fees and costs (Doc. 159), Bad Rhino asserted that it is entitled to costs exceeding $5,000. Bad Rhino, however, failed to comply with D. Kan. R. 54.1. Therefore, the motion is denied without prejudice as to costs.[6]

## IV. Conclusion

TMU's motions for relief from judgment (Docs. 160, 165) are DENIED.

Plaintiff's motion to alter or amend the judgment (Doc. 157) to include prejudgment interest is GRANTED. Plaintiff's motion (Docs. 168) for attorney's fees is GRANTED. Plaintiff's motion for attorney's fees and costs (Doc. 159) is DENIED WITHOUT PREJUDICE with respect to costs AND DENIED AS MOOT with respect to attorney's fees.

IT IS SO ORDERED. Dated this 12th day of September, 2025.

---

[6] The motion is denied as moot with respect to the request for attorney's fees in light of the unopposed motion for fees.

                                                                             <u>s/ John W. Broomes</u>
                                                                             JOHN W. BROOMES
                                                                             UNITED STATES DISTRICT JUDGE